FJN:ADW
F. #2020R00192/OCDETF#WC-UT-0194

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

JESUS GUZMAN-CASTRO,
     also known as "Chuy," "El Narizon" and
    "Pinocho,"

         Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Case No. 22-CR-278 (FB)

## THE GOVERNMENT'S DETENTION MEMORANDUM

JOSEPH NOCELLA, JR.
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Andrew D. Wang
Assistant United States Attorney
(Of Counsel)

## PRELIMINARY STATEMENT

The government respectfully submits this memorandum in support of its application for a permanent order of detention for the defendant Jesus Guzman-Castro, also known as "Chuy," "El Narizon" and "Pinocho." The defendant is a high-ranking member of the Sinaloa Cartel, a violent drug trafficking organization based in Mexico. The defendant was arrested by Mexican authorities on May 5, 2025. He was transferred from Mexico to the United States on August 12, 2025 and is scheduled to appear before the Court tomorrow for an arraignment on the indictment (the "Indictment") in this case. For the reasons set forth below, at his arraignment, the Court should enter a permanent order of detention, as no condition or combination of conditions can assure the safety of the community or the defendant's appearance at trial.

STATEMENT OF FACTS

I.      Guzman-Castro's Role as a High-Level Member of the Sinaloa Cartel[1]

Defendant Jesus Guzman-Castro was a high-ranking member of the Sinaloa Cartel, one of the most violent and prolific drug trafficking organizations operating in Mexico today. As described below, as a senior member of the Sinaloa Cartel, the defendant trafficked enormous amounts of narcotics, operated money laundering networks, and used violence to further the ends of the Sinaloa Cartel.

The Sinaloa Cartel was previously led by Ismael Zambada Garcia, also known as "El Mayo," and Joaquin Archivaldo Guzman Loera, also known as "El Chapo."[2] The defendant was a close associate of the Sinaloa Cartel's leadership cadre. For example, the defendant previously worked directly for Zambada Garcia and trafficked large amounts of cocaine at Zambada Garcia's behest. In addition, the defendant participated in an infamous incident in which Sinaloa Cartel gunmen forced Mexican armed forces to release Ovidio Guzman Lopez, one of the sons of Guzman Loera and himself a senior leader of the Sinaloa Cartel. Specifically, on October 17, 2019, Mexican authorities arrested Guzman Lopez in Culiacan, the capital city of Sinaloa. In response, hundreds of Sinaloa Cartel gunmen attacked Mexican authorities and laid siege to

---

[1]  As permitted by the Second Circuit, the government proceeds by factual proffer in support of its motion for a permanent order of detention. See United States v. LaFontaine, 210 F.3d 125, 130–31 (2d Cir. 2000); United States v. Ferranti, 66 F. 3d 540, 542 (2d Cir. 1995). As this proffer seeks only to articulate facts sufficient to justify detention, it is not a complete statement of all the evidence of which the government is aware or which it will seek to introduce at trial.

[2] Zambada Garcia and Guzman Loera were both charged in the Eastern District of New York across several indictments with engaging in a continuing criminal enterprise and numerous other drug trafficking, firearms, and money laundering offenses. See Case No. 09-CR-466 (BMC). On February 12, 2019, Guzman Loera was convicted of those offenses by a jury and was later sentenced to consecutive terms of life imprisonment and 30 years' imprisonment. The case against Zambada Garcia remains pending.

Culiacan, ultimately forcing Mexican authorities to release Guzman Lopez. The defendant directed numerous men under his command to participate in the siege, thus helping to force the release of one of the Sinaloa Cartel's most senior members.

II.    Guzman-Castro's Drug Trafficking and Money Laundering

The evidence in this case includes, among other things, lawfully intercepted communications, witness testimony, seizures of drugs and drug proceeds, bank records, and photographs. That evidence shows that the defendant directly organized the trafficking of large amounts of cocaine and the subsequent laundering of drug proceeds.

For example, one or more witnesses have heard direct admissions from or have communicated with the defendant regarding large scale drug trafficking. The defendant's admissions and statements show that he sourced thousands of kilograms of cocaine from drug trafficking organizations in Guatemala and then arranged for the transportation of such cocaine through Mexico and into the United States. One or more witnesses will also be able to testify about the defendant's access to firearms and his willingness to use violence to protect the interests of the Sinaloa Cartel.

In addition, electronic communications exchanged between and among the defendant and certain co-conspirators included open discussions of trafficking cocaine, including its packaging, concealment, transportation, and smuggling into the United States. For example, on or about January 27, 2016, the defendant explained to a co-conspirator via electronic messages that the defendant had access to an individual who could install hidden compartments in vehicles at a cost of $10,000. On or about January 28, 2016, the defendant exchanged messages with a co-conspirator regarding the amount of money owed for shipments of cocaine and sent a photograph of several large bundles of U.S. currency wrapped in plastic and labeled with the defendant's

4

nickname, "Chuy." And on or about April 16, 2016, a co-conspirator sent an image to an associate of multiple kilograms of cocaine wrapped in plastic that were also labeled with the name "Chuy."

Bank records further show that after cocaine trafficked by the defendant was sold in the United States, the defendant directed others to systematically launder the proceeds of those drug sales. Between 2020 and 2021, the defendant and his co-conspirators directed others to deposit millions of dollars in cash in U.S. bank accounts held in the names of fictitious corporate entities. Those deposits were usually divided into numerous transactions less than $10,000 at a time to avoid automatic transaction reporting requirements by banks—i.e., structuring.

## II.    Foreign Authorities' Arrest and Extradition of Guzman-Castro

On June 15, 2022, a grand jury sitting in the Eastern District of New York returned the Indictment. Count One charges the defendant with conspiring to distribute cocaine, knowing and having reasonable cause to believe that the cocaine would be unlawfully imported into the United States, in violation of Title 21, United States Code, Sections 959(a), 959(d), 960(a)(3), 960(b)(1)(B)(ii) and 963. Count One carries a statutory maximum of life imprisonment and a mandatory minimum of 10 years' imprisonment.

On May 5, 2025, Mexican law enforcement authorities arrested the defendant in Mexico. One August 12, 2025, the defendant was transferred from Mexico and arrived in the Eastern District of New York on August 12, 2025.

## ARGUMENT

## I.    Legal Standards

Under the Bail Reform Act, 18 U.S.C. §§ 3141 et seq., a federal court must order a defendant detained pending trial where it determines that "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any

5

other person and the community[.]"  18 U.S.C. § 3142(e).  A presumption of dangerousness and risk of flight arises when a defendant is charged with an offense under the Controlled Substances Act or the Controlled Substances Import and Export Act that carries a maximum term of imprisonment of 10 years or more and the Court finds probable cause to believe that the defendant committed such offense.  18 U.S.C. § 3142(e)(3)(A).  Probable cause may be established by the sheer fact that a grand jury has returned an indictment charging the defendant with the offense in question.  See United States v. Contreras, 776 F.2d 51, 54–55 (2d Cir. 1985).

The presumption means that the Court must initially assume there is "no condition or combination of conditions that will reasonably assure the appearance of the person as required and the safety of the community."  18 U.S.C. § 3124(e)(3).  The defendant may rebut this presumption by coming "forward with evidence that he does not pose a danger to the community or a risk of flight."  United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001) (per curiam).  If this burden of production is satisfied, the government retains the burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community and by a preponderance of the evidence that the defendant presents a risk of flight.  See 18 U.S.C. § 3142(f); Mercedes, 254 F.3d at 436; United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985).

The concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'"  United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history).  Indeed—and significantly—danger to the community includes "the harm to society caused by [the likelihood of continued] narcotics trafficking."  United States v. Leon, 766 F.2d 77, 81 (2d Cir. 1985).  In

6

considering risk of flight, courts have found that where the evidence of guilt is strong, it provides "a considerable incentive to flee," United States v. Millan, 4 F.3d 1038, 1046 (2d Cir. 1993), as does the possibility of a severe sentence, see Jackson, 823 F.2d at 7; United States v. Martir, 782 F.2d 1141, 1147 (2d Cir. 1986) (defendants charged with serious offenses with significant maximum terms had potent incentives to flee); see also United States v. Cisneros, 328 F.3d 610, 618 (10th Cir. 2003) (defendant was flight risk because her knowledge of seriousness of charges against her gave her strong incentive to abscond to Mexico).

Courts consider several factors in making the determination of whether pretrial detention is appropriate: (1) the nature and circumstances of the crime charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including family ties, employment, financial resources, community ties, and past conduct; and (4) the nature and seriousness of the danger to any person or the community that would be posed by release. See 18 U.S.C. § 3142(g). Even where the defendant has met his burden of production to rebut the statutory presumption in favor of detention, the presumption also remains a factor for the Court to consider. Mercedes, 254 F.3d at 436.

II.    A Presumption of Detention Applies

This case involves an offense for which there is a presumption that no condition or combination of conditions will reasonably assure the defendant's appearance or the safety of the community. See 18 U.S.C. § 3142(e)(3). Specifically, because the defendant is charged with a count under the Controlled Substances Import and Export Act for which the maximum term of imprisonment is life, he is presumed to pose a danger to the community and a risk of flight. Accordingly, the defendant bears the initial burden of showing that he is not a danger to the

7

community or a flight risk.  For the reasons set forth below, the defendant cannot sustain that burden.

III.    Guzman-Castro Is a Danger to the Community

The facts and circumstances of this case compel the defendant's detention, as the relevant Bail Reform Act factors show that he poses a danger to the community.

The count with which the defendant is charged—participating in an international narcotics importation and distribution conspiracy—is extremely serious and carries a 10-year mandatory minimum prison sentence.  See 21 U.S.C. §§ 963, 960(b)(1)(A), 960(b)(1)(B)(ii).  The defendant committed that crime as a senior member of the Sinaloa Cartel, a powerful criminal organization with the manpower, arms, and willingness to use violence against Mexican authorities.  As explained earlier, the defendant directed gunmen to participate in the Sinaloa Cartel's October 2019 attack on Mexican government authorities to free Ovidio Guzman Lopez from captivity.  Therefore, the defendant has shown not only a willingness to threaten and endanger the people of the United States through the trafficking of illicit drugs, but also the capacity to commit direct violence against law enforcement figures to further his criminal ends.  As such, the defendant poses an extremely high danger to the community.

IV.    Guzman-Castro Poses a Significant Risk of Flight

Similarly, the defendant cannot overcome the presumption that he is a risk of flight, for several reasons.

First, if convicted of Count One, he faces a mandatory minimum sentence of 10 years' imprisonment and a statutory maximum of life imprisonment.  Given the significant jail time that the defendant faces upon conviction, he has a strong incentive to flee the jurisdiction.  See Jackson, 823 F.2d at 7 (prospect of severe sentence creates incentive to flee); Martir, 782 F.2d

8

at 1147 (charges with significant maximum terms created potent incentive to flee); Cisneros, 328 F.3d at 618 (seriousness of charges gave defendant strong incentive to abscond).

Second, the defendant's personal history and characteristics demonstrate that he is a significant flight risk. The defendant has no known personal ties to the United States and has been brought to the United States for the sole purpose of facing criminal prosecution. He has no legal status in this country. Given his absence of any connection to the United States (aside from his drug trafficking activities) and his extensive ties to Mexico, the defendant constitutes a significant risk of flight.

CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court order the defendant to be detained permanently pending trial, as there is no condition or combination of conditions that could reasonably assure the safety of the community or the defendant's appearance at trial.

Dated:      Brooklyn, New York
            August 13, 2025


                                        Respectfully submitted,

                                        JOSEPH NOCELLA, JR.
                                        UNITED STATES ATTORNEY
                                        Eastern District of New York
                                        271 Cadman Plaza East
                                        Brooklyn, New York 11201

                              By:        /s/
                                        Andrew D. Wang
                                        Assistant U.S. Attorney
                                        (718) 254-6311